Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| ALVERIO SERVICE STATION, INC.; ESTRELLA SERVICES STATION, INC.; TO GO STORES, LLC<br><br>Recurrentes<br><br>v.<br><br>MUNICIPIO AUTÓNOMO DE CAGUAS<br><br>Recurrido<br><br>SAMMY ODEH & SONS, INC.<br><br>Concesionario | KLRA202200442<br><br>CONSOLIDADO CON:<br><br>KLAN202200646 | *Revisión Administrativa* procedente de la Oficina de Permisos Municipio Autónomo de Caguas<br><br>Caso Núm.: 2018-248898-PCO-0117383; 2019-288289-PCOC-003560; 2019-289469-PU-014630; 2019-288289-PCOC-005541.<br><br>Caso Civil Núm.: CG2022CV01745<br><br>Sobre: Revocación de Permisos; Interdicto Estatutario, Art. 14 Ley 161 de 2009. |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Adames Soto, la Jueza Mateu Meléndez y el Juez Marrero Guerrero.

Rodríguez Casillas, juez ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 7 de febrero de 2024.

El **11 de agosto de 2022**, comparecieron ante nos **Alverio Service Station, Inc., Estrella Service Station, Inc., y To Go Stores, LLC** (en adelante, "**recurrentes**") mediante un recurso de *Revisión Administrativa*. Nos solicitan que revisemos una *Resolución* notificada el 12 julio de 2022 por la División de Revisiones Administrativas de la Oficina de Gerencia y Permisos (en adelante, "**DRA-OGPe**"), en el cual, determinó **no acoger** una Revisión Administrativa y Solicitud de Paralización de Obras de Construcción, núm. 2022- 44593-SDR009529, presentada por los

recurrentes para impugnar los permisos:[1] **(1) 2018-248898-PCO-017383**;[2] **(2) 2019-289469-PU-014630**;[3] **(3) 2019-288289-PCOC-003560**;[4] y **(4) 2019-288289-PCOC-005541**,[5] emitidos a favor de **Sammy Odeh & Sons, Inc.**, (en adelante, "**Sammy Odeh**") por la **Oficina de Permisos del Municipio Autónomo de Caguas** (en adelante, "**OP-MAC**").

Además, el **15 de agosto de 2022** los recurrentes acudieron ante nos mediante un recurso de *Apelación.* En este, solicitan la revisión de una *Sentencia* del Tribunal de Primera Instancia (en adelante, "**TPI**"), Sala Superior de Caguas, notificada el 14 de julio de 2022, en la cual determinó que no procedía la petición de interdicto estatutario instada por los recurrentes al amparo del Artículo 14.1 de la Ley 161-2009. En vista de ello, impuso el pago de honorarios de abogado a favor de Sammy Odeh y del Municipio Autónomo de Caguas.

El **29 de agosto de 2022**, ordenamos la consolidación de los recursos KLRA202200442 y KLAN202200646, conforme a la Orden Administrativa DJ-2019-316 y la Regla 80.1 del Reglamento del Tribunal de Apelaciones.[6]

Luego de recibir la Transcripción de la Prueba Oral (TPO), examinar los recursos presentados y de ponderar los argumentos esbozados por ambas partes, **confirmamos** los dictámenes recurridos. Veamos el fundamento.

**-I-**

En primer orden, examinemos el tracto procesal y los hechos que originan los recursos ante nos.

---

[1] Véase, Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 1-4.
[2] Permiso de construcción certificado para estación de gasolina.
[3] Permiso único de operación para estación de gasolina y tienda de conveniencia.
[4] Permiso de construcción enmendado para la estación de gasolina y tienda de conveniencia. Obsérvese, que por error involuntario se expresó el núm. 2019-288289-PCOC-**003580**, cuando lo correcto es 2019-288289-PCOC-**003560.**
[5] Enmienda a los fines de incluir la instalación de 2 despachadores de gasolina adicionales.
[6] 4 LPRA Ap. XXII-B.

El **27 de junio de 2014**, Total Petroleum Puerto Rico Corp (en adelante, "Total") vende la gasolinera objeto de controversia en este caso, a Sammy Odeh, la cual, consistía de dos lotes. Posterior a ello, el **29 de junio de 2016** Sammy Odeh solicitó una **primera** Pre-Consulta, por lo que sometió ante la OP-MAC los siguientes documentos: Escritura de Compraventa Núm. 43 del 27 de junio de 2014;[7] Contrato de Arrendamiento, Escritura Núm. 44 del 27 de junio de 2014;[8] Acta Notarial de 18 de mayo de 2013;[9] Contrato de Subarriendo para Estación #220880 de 27 de junio de 2014;[10] Certificación de No Presencia de Asbesto en Estructura;[11] Certificación de No Presencia de Pintura con Base de Plomo en Estructura a Demolerse;[12] y, Breve Explicación de la Pre-Consulta.[13] En dicha Explicación Pre-Consulta, le indicó a la OP-MAC que se proponía la reconstrucción de una nueva tienda de conveniencia y un techo para el área de despacho de combustible con un **permiso de uso** núm. 45165-ARPE-HUMACAO.[14] La demolición de la antigua tienda de conveniencias y remodelación gasolinera respondió a los riesgos de seguridad que representaban al público y a las sugerencias de los representantes de la compañía de seguros.

El **31 de agosto de 2016** la OP-MAC emitió una **primera** *Determinación sobre Pre-Consulta* de reconstrucción presentada por Sammy Odeh en la cual resolvió lo siguiente:

1. La pertenencia ubica dentro de un Distrito Comercial Intermedio (C-I).
2. La Sección 23.1.6 del Reglamento Conjunto establece que la separación radial entre una estación de gasolina y una escuela pública o privada o institución educativa post-

---

[7] Véase, Apéndice del recurso KLRA202200442, en las págs. 74-88.

[8] Véase, Apéndice del recurso KLRA202200442, en las págs. 30-54.

[9] Véase, Apéndice del recurso KLRA202200442, en las págs. 62-69.

[10] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 55-84.

[11] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 85-86.

[12] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 87-88.

[13] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 26-29.

[14] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la págs. 25.

secundaria será de mil (1,000) pies o trescientos cinco (305) metros, según dispuesto en la Ley Núm. 169 de 26 de julio de 2003.

3. La estación propuesta no cumple con lo dispuesto en el Reglamento toda vez que está localizada a menos de veinte (20) metros de distancia de una institución educativa.

4. Por tal razón, tendrá que considerar otro uso que esté permitido dentro de un distrito C-I.

5. Se recomienda iniciar los trámites para la remoción o cierre de los tanques soterrados toda vez que el uso de estación de gasolina no puede ser autorizado. Para ello, deberá consultar al Área de Calidad de Agua y obtener las autorizaciones correspondientes.

6. Cabe mencionar que existe una querella registrada bajo el caso QXP-2015-02001 en nuestros archivos. Esto, por realizar trabajos de demolición sin permiso.

7. A esos efectos, deberá efectuar el pago de la multa administrativa emitida (Boleto 50758). De no cumplir con lo requerido, procederemos con las acciones administrativas que correspondan.[15]

El **20 de septiembre de 2018** Sammy Odeh sometió una **segunda** Pre-Consulta de Reconsideración de Uso,[16] acompañada de un *Memorial Explicativo,*[17] en el cual, le anejó los siguientes documentos: Determinación sobre Pre-Consulta del 31 de agosto de 2016;[18] Certificado de Incorporación del Departamento de Estado de P.R., a favor de Sammy Odeh;[19] Certificado de Cumplimiento (Good Standing) de Sammy Odeh;[20] Resolución Corporativa del 3 de agosto de 2018, a favor del Sr. Ibrahim Odeh como Administrador de Sammy Odeh;[21] Carta de 7 de junio de 2016 del Sr. Jan Carlos Rodríguez, Director de Red de Estaciones de Total Petroleum Puerto Rico Corp ("**TPPRC**");[22] Acuerdo de Traspaso de 24 de junio de 2014

---

[15] Véase, Apéndice del recurso KLRA2O2200442, en las pág. 91.

[16] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 89.

[17] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 90-101.

[18] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 103.

[19] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 104.

[20] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 105.

[21] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 106.

[22] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 107.

entre TPPRC y Sammy Odeh;[23] Permiso de Operación Conforme al Reglamento para el Control de Tanques de Almacenamiento Soterrados de la Junta de Calidad Ambiental ("**JCA**"), firmado el 28 de junio de 2018 por Wilmarie Rivera Otero, Jefa de la División de Control de Tanques de Almacenamiento Soterrados, Área de Calidad de Agua;[24] Plano de Localización de Gasolinera Sammy Odeh;[25] y, Escritura de Compraventa Núm. 43 del 27 de junio de 2014.[26] En resumen, el Memorial Explicativo aclaró que la gasolinera está ubicada en ese predio <u>antes</u> de que la institución educación superior Huertas Junior College; además, ambas entidades están separadas por una calle local en la que transcurren automóviles en ambas direcciones. Indicó que el permiso de uso *(in rem)* se mantuvo vigente, aunque la gasolinera estuvo (involuntariamente) sin operar durante menos de 2 años en que el proceso de reconstrucción, remodelación y ampliación estuvo llevándose a cabo, por lo que el proponente siempre tuvo la intención de continuar la operación del mismo negocio, en el mismo lugar y bajo la misma huella. Prueba de ello, fue el proceso ante la JCA para la certificación de los tanques soterrados de almacenamiento gasolina que se extendió hasta el 28 de junio de 2018. En cuanto a la demolición sin los permisos correspondientes, ello se debió a que tuvo que realizarlo con carácter de urgencia, ya que "*la compañía de seguros se negaba a ofrecer la cubierta, porque la estructura estaba muy deteriorada y representaba un peligro para la vida de los visitantes*"; así, solicitó que se le condonara tal acción, no intencional.[27]

---

[23] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 108-109.
[24] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 110-111.
[25] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 112.
[26] Véase, Apéndice del recurso KLRA202200442, en las págs. 74-88.
[27] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 90-101.

El **27 de septiembre de 2018**, la OP-MAC emitió una **segunda** *Determinación sobre Pre-Consulta* a la reconsideración sometida por Sammy Odeh. Por su importancia, citamos *in extenso*:

1. *La propiedad ubica en un Distrito **Comercial Intermedio (C-I)**.*
2. *La estación de gasolina llevó sus operaciones con un Permiso de Uso para Estación de Gasolina bajo el caso 99-46-D-890-HPU emitido por la ARPE.*
3. *El cierre de la Estación de Gasolina fue involuntario, según demostrado en documentos presentados por el proponente en el caso.*
4. *La demolición de la estructura fue requerida por la compañía de seguros; según documentos presentados, dicha compañía se negaba a dar cubierta por el mal estado de la estructura.*
5. *Los tanques de almacenaje de combustible permanecen en el predio, lo que demuestra la intención de continuar operaciones.*

   **Por lo anterior, la Oficina de Permisos concluye que a pesar de que el uso no ha operado por un término mayor de dos (2) años, lo cierto es que el uso ha sido uno ininterrumpido, ya que existe evidencia del interés del propietario de continuar con la operación de dicho uso. Por lo tanto, el uso propuesto cumple y puede ser solicitado como un cambio de dueño o de nombre. Todo lo anterior sujeto a las siguientes directrices:**

   1. *Tendrá que presentar la correspondiente Solicitud de Permiso de Construcción Certificado, que incluya planos para la construcción del edificio que albergará los usos solicitados. Los planos finales para la estructura cumplirán con todas y cada una de las disposiciones del Reglamento de Edificación de Puerto Rico de 2011 y las enmiendas adoptadas al Uniform Building Code de 2009; y sin limitaciones, aquellas relacionadas a: ventilación, seguridad, protección contra incendios, medios de salidas, barreras arquitectónicas y cualquier otra reglamentación aplicable vigente. Estos planos deberán presentarse según lo dispuesto en el Capítulo 15 del Reglamento Conjunto para las Obras de Construcción y Usos de Terrenos del 29 de noviembre de 2010.*
   2. *Luego corresponde que formalice su Solicitud de Permiso de Uso Certificado, bajo las disposiciones del Reglamento Conjunto, sobre cambio de dueño o de nombre del uso existente.*[28]

El **20 de febrero de 2019** los recurrentes presentaron una *Solicitud de Intervención y en Oposición a Solicitud de Permiso* ante

---

[28] Véase, Apéndice del recurso KLRA202200442, en las págs. 98-99. Énfasis nuestro.

la **OP-MAC**. En resumen, arguyeron que la solicitud de permiso de construcción fue presentada ilegalmente, toda vez que la gasolinera no opera hace mucho más de dos (2) años y colinda con propiedades residenciales; además, de ubicarse a menos de 1,000 pies de unas instituciones educativas.[29] La referida solicitud de parte interventora fue autorizada mediante Resolución.[30]

Conforme a la reconsideración de la *Determinación sobre Pre-Consulta* antes dicha, el **21 de febrero de 2019** la OP-MAC **autorizó** el Permiso de Construcción y Remodelación núm. **2018-248898-PCO-017383**, solicitado por Sammy Odeh.[31] Concluyó que el permiso de uso dado a la estación de gasolina estaba vigente, por lo que se procedería con la emisión de un Permiso de Uso, bajo la figura de cambio de dueño o cambio de nombre.

Inconformes, el **19 de marzo de 2019**, los recurrentes presentaron una **primera** *Solicitud de Revisión Administrativa,* caso núm. 2019-257819-SDR-003104 ante la División de Revisiones Administrativas de la Oficina de Gerencia y Permisos (en adelante, "**DRA-OGPe**"), en el cual, solicitaron la nulidad del permiso de construcción y remodelación núm. **2018-248898-PCO-017383**. Este caso fue devuelto por la DR-OGPe a la OP-MAC para que notificara dicho permiso de construcción y remodelación a todas las partes, que incluía a la Oficina de Asuntos Monopolísticos del Departamento de Justicia de P.R. Cabe indicar que el 22 de agosto de 2019, la OP-MAC notificó correctamente dicho permiso de construcción.[32]

---

[29] Véase, Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 208-215.

[30] Véase la Resolución que autoriza la intervención de los recurrentes, notificada el 28 de febrero del 2019, en el Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 94-96.

[31] Véase, permiso de construcción núm. **2018-248898-PCO-017383**, en el Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 31-35.

[32] Véase, caso núm. KLRA202000033, a la pág. 3. Véanse, además, Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en la pág. 217; y, la *Oposición a la Solicitud de Apelación KLAN202200646 de la OP-MAC*, en la pág. 2.

No obstante, el **21 de marzo de 2019**, los recurrentes presentaron ante el TPI el caso civil núm. CG2019CV00953,[33] sobre interdicto sumario, provisional, preliminar y permanente en contra de Sammy Odeh y la OP-MAC, en virtud del Artículo 14.1 de Ley Núm. 161-2009, *infra*.[34] En resumen, alegaron que la otorgación del permiso de construcción y remodelación se concedió mediante información falsa o engañosa.[35]

El **10 de abril de 2019**, el TPI concluyó en el caso civil núm. CG2019CV00953 que los recurrentes no cumplieron con los requisitos necesarios en derecho para un remedio interdictal, por lo que procedía la desestimación de su faz, y la continuación de los procesos administrativos ante la **DRA-OGPe**, que todavía estaba pendiente.[36]

En descuerdo, los recurrentes acuden en auxilio de jurisdicción y en apelación al Tribunal de Apelaciones (en adelante, "**TA**"), por lo cual, el **12 de abril de 2019** acogió el **KLAN201900401** como un *certiorari*, declaró *sin lugar* el auxilio de jurisdicción y denegó la expedición del auto de *certiorari* para la paralización de la construcción comenzada por Sammy Odeh.[37] Posteriormente, el Tribunal Supremo (en adelante, "**TS**") declinó revisar la resolución del TA y una solicitud de reconsideración ante sí.[38]

El **31 de julio de 2019** los recurrentes acuden nuevamente ante la OP-MAC mediante escrito intitulado, "*Solicitud de Paralización de Proyecto en Construcción y para que se Resuelva la*

---

[33] En específico, comparecieron como demandantes: Caguas Petroleum Corp.; Odeh Petroleum; Berwin Fuel Corp.; Alverio Service Station, Inc.; Estrella Service Station, Inc.; y Hernández Vélez, Inc. Po su parte, los demandados fueron: Sammy Odeh & Sons, Inc.; Municipio Autónomo de Caguas; Departamento de Justicia, Oficina de Asuntos Monopolísticos, entre otros.

[34] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en la pág. 12 y la nota al calce núm. 2.

[35] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 1-10.

[36] *Id,* a la pág. 10.

[37] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 11-18.

[38] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 19-20.

*Oposición a Solicitud de Permiso"*,[39] En síntesis, reiteraron íntegramente las alegaciones presentadas el 20 de febrero de 2019 en la *Solicitud de Intervención y en Oposición a Solicitud de Permiso* ante la OP-MAC.

El **11 de septiembre de 2019**, los recurrentes presentaron una **segunda** *Solicitud de Revisión Administrativa,* caso núm. 2019-257819-SDR-003461 ante **DR-OGPe**, en el cual, volvieron a impugnar el permiso de construcción núm. **2018-248898-PCO-017383**, concedido por la OP-MAC. Entre otras cosas, alegaron que la obra excedía el máximo de ocupación, no se celebraron vistas públicas y no cumplía los parámetros de colindancia con un predio residencial.[40]

Con posterioridad, el **29 de octubre de 2019** Sammy Odeh presentó ante la OP-MAC una Solicitud de enmienda permiso de construcción **2018-248898-PCO-017383**. En esta, solicitó que se incluyera en el permiso la construcción de una tienda de conveniencia ("mini market").

El **15 de noviembre de 2019**, —y aún pendiente la segunda Solicitud de Revisión núm. 2019-257819-SDR-003461 ante la **DR-OGPe**—, la **OP-MAC** autorizó una enmienda al permiso de construcción y concedió un Permiso de Uso Único, núm. **2019-288289-PCOC-003560** para la operación de la estación de gasolina y tienda de conveniencia.[41] El referido permiso fue notificado a los recurrentes el 2 de diciembre de 2019, quienes figuraban como partes interventoras. Posteriormente, el **20 de diciembre de 2019** la OP-MAC expidió el permiso referente a la operación de la estación

---

[39] Véase, Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 217-224.

[40] Véase, caso núm. KLRA202000033, a la pág. 3.

[41] Véase, permiso núm. **2019-288289-PCOC-003560**, en el Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 45-50.

de gasolina y la tienda de conveniencia, núm. **2019-289469-PU-014630**.[42]

Entretanto, —y con respecto a la segunda Solicitud de Revisión núm. 2019-257819-SDR-003461—, el **6 de diciembre de 2020** la **DR-OGPe** emitió una Minuta y Orden en la que prorrogó por un periodo de treinta (30) días adicionales el término para revisar el permiso de construcción, núm. 2018-248898-PCO-017383. Sin embargo, luego de pasados los treinta (30) días, la **DR-OGPe** no se expresó, por tanto, la agencia revisora perdió jurisdicción sobre dicha revisión administrativa.

De otra parte, —y ante la actuación de la Oficina de Permisos del Municipio al conceder el Permiso Único—, el **23 de diciembre de 2019**, los recurrentes presentaron una **tercera** Revisión Administrativa y solicitud de paralización de obras de construcción, núm. 2019- 257819-SDR-003734, ante la **DR-OGPe**, en la que solicitaron la revisión del permiso único de construcción núm. **2019-288289-PCOC-003560**,[43] que había sido notificado el 2 de diciembre de 2019. Sobre dicha solicitud de revisión administrativa, el **3 de enero de 2020**, la **DR-OGPe** emitió una Notificación acogiendo solicitud de Revisión Administrativa.

El **21 de enero de 2020**, los recurrentes presentan el recurso de revisión **KLRA202000033** ante el TA para la revisión de la otorgación del Permiso de Construcción **2018- 248898-PCO-017383** y el Permiso de Uso (Permiso Único) **2019-289469-PU1014630**, ambos emitidos por la OP-MAC.

Entre tanto, el **28 de febrero de 2020** la OP-MAC expidió un permiso adicional (núm. **2019-288289-PCOC-005541**) a los fines de enmendar el Permiso de Construcción original, con miras de

---

[42] Véase, permiso núm. **2019-289469-PU-014630**, en el Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 36-44.
[43] Permiso de Construcción Enmendado.

incluir la instalación de dos despachadores ("surtidores") de gasolina adicionales.[44]

El **13 de marzo de 2020** el TA emitió una Sentencia en el caso **KLRA202000033**, en la que declaró carecer de jurisdicción por ser prematuro el recurso de revisión de los recurrentes. A esos fines, razonó:

> *Del trasfondo procesal se desprende que estamos ante un proceso administrativo de evaluación para la revisión de un permiso de construcción de una gasolinera. Aunque dicho permiso originalmente fue expedido el 21 de febrero de 2019,* ***Núm. 2018- 248898-PCO-017383****, posteriormente sufrió enmiendas y se notificó el nuevo Permiso de Construcción* ***Núm. 2019-288289-PCOC-003560*** *(Permiso de Construcción Enmendado).* ***<u>Este último se encuentra actualmente ante la revisión de la OGPe en el Caso 2019-257819- SDR-003734, sin que dicho trámite haya concluido, o el foro administrativo haya perdido jurisdicción.</u>***[45]

El **4 de septiembre de 2020**, —y vencido el término sin que la **DR-OGPe** emitiera Resolución alguna en la **tercera** <u>Revisión Administrativa y solicitud de paralización de obras de construcción, núm. 2019- 257819-SDR-003734</u>—, los recurrentes radican el recurso de revisión judicial **KLRA202000312** ante el TA. En síntesis, solicitaron la revisión de los siguientes permisos: **(1) 2018-248898-PCO-017383** (Permiso de Construcción Certificado para estación de gasolina del 21/feb/2019); **(2) 2019-288289-PCOC-003560** (Permiso de Construcción Enmendado para la estación de gasolina y tienda de conveniencia del 15/nov/2019); y, **(3) 2019-289469-PU-014630** (Permiso Único de Operación para estación de gasolina y tienda de conveniencia del 20/dic/2019).

El **18 de noviembre de 2020**, el TA emitió una sentencia en el caso **KLRA202000312**, en el que resolvió que carecía de jurisdicción para atender el asunto, dado que los tres (3) permisos antes emitidos por la OP-MAC no fueron notificados conforme a

---

[44] Véase, permiso núm. **2019-288289-PCOC-005541**, en el Apéndice de la *Revisión Administrativa* del recurso KLRA202200442, en las págs. 51-56.

[45] Véase, caso núm. KLRA202000033, a las págs. 6-7.

derecho; por lo cual, el TA ordenó a la OP-MAC a que notificara nuevamente los mismos.[46]

Así las cosas, el **27 de mayo de 2022** los recurrentes radican la presente *Demanda y Petición de Interdicto Estatutario*, (caso civil núm. CG2022CV01745) contra Sammy Odeh y la OP-MAC. En síntesis, en virtud del Artículo 14.1 de la Ley Núm. 161-2009, *infra*, solicitaron la paralización de la estación de gasolina, alegando que operaba de forma ilegal al no expedirse los permisos conforme a derecho.[47]

En cumplimiento con lo ordenado por el TA en el caso **KLRA202000312**, el **8 de junio de 2022**, la OP-MAC notificó a las partes los tres (3) permisos allí indicados; además, fue notificado el cuarto permiso **2019-288289-PCOC-005541** expedido el 28 de febrero de 2020.[48]

En reacción a dicha notificación, el **28 de junio de 2022** los recurrentes instaron una **cuarta** Revisión Administrativa y Solicitud de Paralización de Obras de Construcción, núm. 2022- 44593-SDR-009529, ante la **DR-OGPe** para que revocara los cuatro (4) permisos expedidos: **(1) 2018-248898-PCO-017383** del 21/feb/2019); **(2) 2019-288289-PCOC-003560** del 15/nov/2019); **(3) 2019-289469-PU-014630** del 20/dic/2019 y **(4) 2019-288289-PCOC-005541** del 28/feb/2020.

En atención a la *Demanda y Petición de Interdicto Estatutario* del presente caso civil núm. CG2022CV01745, el **5 de julio de 2022** el TPI notificó la Sentencia aquí apelada, luego de celebrar vista en su fondo el 10 y 17 de junio de 2022.[49]

---

[46] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 21-24.

[47] Véase, el Apéndice del recurso de Apelación KLAN202200646, en las págs. 1-25.

[48] Véase, Apéndice del recurso KLRA202200442, en la pág. 61.

[49] La prueba testifical de los recurrentes fue la siguiente: (1) Sr. Felix F. Bermudez Vega; y (2) Perito - Edwin A. Ayala Ramírez, ingeniero. En cuanto a Sammy Odeh, la prueba testifical fue la siguiente: (1) Perito – José Ortíz Rodríguez, ingeniero; y (2) Sr. Aram Odeh. Véanse los testimonios en la Transcripción de la Prueba Oral Estipulada ("**TPOE**") de los días 10 y 17 de junio de 2022. Los siguientes Exhibits

Primeramente, a tono con el Art. 14.1 de la Ley 161-2009, el TPI puntualizó la controversia como sigue:

> **En el caso de marras nuestra facultad para intervenir en la validez del permiso de reconstrucción y remodelación otorgado está limitada a determinar si el mismo se obtuvo utilizando información falsa o incorrecta.**
>
> **Ergo**, si Sammy Odeh demolió a Total Petroleum, si la estación llevaba cerrada 6 años a la fecha en que se solicitó el permiso de reconstrucción y remodelación, si el permiso de uso de la estación había vencido a la fecha en que Sammy Odeh solicitó el permiso de reconstrucción y remodelación, si lo que procedía era peticionar la aprobación de un permiso para una nueva estación de gasolina, si se necesitaba cumplir con el proceso de vistas públicas, si el sistema de tanques soterrados de la estación ubica a menos de 1,000 metros de distancias de escuelas y centros educativos, nada de ello justifica nuestra intervención con los permisos, ni es fundamento para la expedición del interdicto dispuesto en el Artículo 14.1, supra. Esas controversias escapan la jurisdicción de esta Sala.
>
> **La única causal por la cual pudiésemos expedir el interdicto estatutario que se nos solicita es si el permiso de remodelación y reconstrucción fue obtenido mediando información falsa o incorrecta.**[50]

Puntualizada la controversia de este caso, en lo pertinente el TPI esbozó el derecho a aplicar:

> La Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161-2009, define "Certificación de Exclusión Categórica", como una declaración escrita que somete el solicitante certificando que la acción o actividad que se propone llevar a cabo, en el curso normal de su ejecución, no conlleva un impacto ambiental significativo y/o que la misma está expresamente excluida del proceso

---

fueron admitidos en evidencia: **Exhibits 1 –** Fotografía; **Exhibits 2 –** Patente municipal #3762; **Exhibits 3 –** Acta Notarial Escritura 43 de 8 de marzo de 2013; **Exhibits 4 –** Escritura de Compraventa # 43 de 27 de junio de 2014; **Exhibits 5 –** Fotografía; **Exhibits 6 –** Determinación Pre-Consulta de 31 de agosto de 2016; **Exhibits 7 -** Determinación Pre-Consulta de 20 de septiembre de 2018; **Exhibits 8 –** Active Site LUST List 2018; **Exhibits 9 -**Certificación de Cumplimiento Ambiental por Exclusión Categórica, expedido el 10 de diciembre de 2018, núm. caso 2018-248898-dec-068870; **Exhibits 10 –**2018-248898-PCO-017383 (Permiso de Construcción Certificado para estación de gasolina del 21/feb/2019); **Exhibits 11 -** 2019-288289-PCOC-003560 (Permiso de Construcción Enmendado para la estación de gasolina y tienda de conveniencia del 15/nov/2019); **Exhibits 12 -** 2019-289469-PU-014630 (Permiso Único de Operación para estación de gasolina y tienda de conveniencia del 20/dic/2019); **Exhibits 13A –** Parte I de Informe pericial del Ing. Edwin A. Rodríguez, perito de los recurrentes; **Exhibits 13B -** Parte II de Informe pericial del Ing. Edwin A. Rodríguez, perito de los recurrentes; **Exhibits 13C -** Parte III de Informe pericial del Ing. Edwin A. Rodríguez, perito de los recurrentes; Exhibits 14 – Resolución de permiso 2018-248898-PCO-017383 (Permiso de Construcción Certificado para estación de gasolina del 21/feb/2019); y, **Exhibits 15 –** Permiso de Uso de 1999, núm. 15165. Véanse los Exhibits, en el Apéndice del recurso de Apelación KLAN202200646, en las págs. 477-658. Énfasis nuestro.

[50] Véase, la Sentencia apelada en el Apéndice del recurso de Apelación KLAN202200646, en las págs. 438-439. Énfasis nuestro.

*de planificación ambiental por una ley o reglamento. Define "Determinación de Cumplimiento Ambiental" como aquella determinación que realiza el director ejecutivo de la Oficina de Gerencia e Permisos, o la Junta Adjudicativa, certificando que el proponente de la acción ha cumplido con todos los requisitos, sustantivos y procesales del Artículo 4(B)(3) de la Ley sobre Política Pública Ambiental, Ley 416-2004, según enmendada, y con sus reglamentos aplicables. Define el término "Determinación de Cumplimiento Ambiental por Exclusión Categórica", como el dictamen que realiza un profesional autorizado, o el director de la Oficina de Gerencia de Permisos, certificando que la acción y/o actividad y/o proyecto propuesto no requiere de ulterior planificación ambiental por estar clasificado como una exclusión categórica. Se dispone, además, que serán exclusiones categóricas todas aquellas acciones y/o actividades que así determine la Junta de Calidad Ambiental ("JCA") mediante reglamento, orden o resolución.*

*El Artículo 8.5 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161-2009, confirió a la JCA la autoridad para reglamentar las acciones, que, por su naturaleza rutinaria y predecible en el curso normal de su ejecución, no tendrán un impacto ambiental significativo, por lo que pueden ser consideradas exclusiones categóricas. Ello implica que el proponente no tendrá que preparar un documento ambiental para aquellas acciones y/o actividades que, la JCA haya catalogado como exclusiones categóricas, y se obtenga una determinación de cumplimiento ambiental por exclusión categórica por parte de la Oficina de Gerencia de Permisos, ("OGPe").*

*Como indicamos previamente, las acciones y/o actividades que la Junta de Gobierno de la JCA haya identificado como exclusiones categóricas pueden ser reclamadas como tal mediante una solicitud de determinación de cumplimiento ambiental por exclusión categórica ante la OGPe. Como parte de la solicitud de determinación de cumplimiento ambiental por exclusión categórica, el peticionario viene obligado a certificar que la información provista en la solicitud es veraz, correcta y completa, y que la acción propuesta cualifica como una exclusión categórica.*

*El Artículo 119 A(1)(2) del Reglamento de Evaluación y Trámite de Documentos Ambientales ("RETDA"), que emitió la JCA, dispuso para el establecimiento de las exclusiones categóricas que podrían ser peticionadas ante la OGPe durante el proceso de determinación de cumplimiento ambiental. Al amparo de dicho articulado la JCA emitió Resolución 11-17, de 21 de noviembre de 2011, Sobre Enmienda al Listado de Exclusiones Categóricas. Dicha Resolución contiene el listado de las acciones o actividades que la agencia determinó cumplen con los parámetros establecidos para ser consideradas exclusiones categóricas. La exclusión número 45 de dicho listado permite remodelar una estación de gasolina, y sustituir sus tanques soterrados por unos de igual o menor capacidad, cuando ello se realiza dentro de la huella original de la estación.*

> *"Remodelación de estación de servicio (i.e., gasolinera) incluyendo el reemplazo de tanques soterrados existentes por unos de igual o menor capacidad **dentro de la huella original de la estación de servicio**."*

*El RETDA fue derogado por el <u>Reglamento para el Proceso de Evaluación Ambiental</u>, Reglamento número 8858, de 23 de noviembre de 2016 ("RPEA"). Este*

> *Reglamento en su Artículo 125, dispone que las acciones predecibles o rutinarias que no conllevan un impacto ambiental significativo en el curso normal de sus ejecuciones pueden ser consideradas exclusiones categóricas, siempre que cumplan con las disposiciones de dicho reglamento.*
>
> *Aun cuando la JCA haya previamente considerado una acción o actividad como exclusión categórica, el proponente siempre viene obligado a certificar que la acción o actividad cumple con los requisitos establecidos en el Artículo 129 de RPEA. Uno de los requisitos es que no haya una determinación de la JCA u otras agencias gubernamentales estatales o federales, que el área donde se pretende llevar a cabo la acción u obra está afectada por un grado de contaminación que excede el permitido por los reglamentos vigentes.[51]*

Presentada la controversia y el derecho a dilucidar, el TPI razonó y resolvió lo siguiente:

> *Para la obtención del permiso de reconstrucción y remodelación objeto de la disputa ante nuestra consideración, Sammy Odeh sometió una certificación de cumplimiento ambiental amparada en la exclusión categórica #45 contenida en la <u>Resolución</u> 11-17 emitida por la JCA. En respuesta a la misma, la OGPe emitió Certificación de Cumplimiento Ambiental por Exclusión Categórica. La referida certificación, en su sección pertinente, lee de la siguiente manera:*
> <u>Condiciones Generales</u>
> *De acuerdo con la solicitud de esta Determinación, se certificó el cumplimiento con los siguientes requisitos, cuyo incumplimiento podrá repercutir en la revocación de esta Determinación:*
> ***1.*** *Las actividades de uso o de construcciones livianas de nuevas estructuras no están ubicadas o desarrolladas en:*
> > ***a.*** *...*
> > ***b.*** *Áreas en las que la Junta de Calidad Ambiental (JCA) u otras agencias gubernamentales estatales o federales hayan determinado que existe un grado de contaminación que excede el permitido por los reglamentos vigentes.*
>
> *La parte demandante [parte recurrente] arguye que la certificación de cumplimiento ambiental fue obtenida mediante información falsa e incorrecta, por cuanto a la fecha en que se solicitó la misma, la JCA había determinado que el predio de terreno donde ubica la estación de gasolina de Sammy Odeh adolecía de un grado de contaminación que excedía el permitido por los reglamentos vigentes para aquel entonces. Para sostener su posición, sometió un listado emitido por la JCA de tanques soterrados que filtraban ("Leaking Underground Storae Tank", t/c/c "**LUST**"). En ese listado figuran los tanques soterrados de la estación de gasolina objeto de controversia en este caso. Es decir, para la fecha en que se peticionó la exclusión categórica #45, la estación de gasolina de Sammy Odeh figuraba en la lista de "LUST".*

---

[51] Véase, la Sentencia apelada en el Apéndice del recurso de Apelación KLAN202200646, en las págs. 439-441. Énfasis nuestro.

> *Sin embargo, ello resulta insuficiente para sostener la alegación de los demandantes [recurrentes] que la certificación de cumplimiento ambiental fue obtenida mediante información falsa o incorrecta.*
>
> *En primer lugar, no hay disposición alguna que impida peticionar y hacer uso de la exclusión categórica para una estación de gasolina cuyos tanques están incluidos en el "LUST List". Tampoco existe disposición alguna que, como parte del trámite para solicitar una certificación de cumplimiento ambiental por exclusión categórica, requiera reportar o informar que una estación de gasolina está en el "LUST List".*
>
> *La prohibición para hacer uso de la exclusión categórica, que cita la parte demandante [parte recurrente], **lo que dispone es que no se podrán utilizar las exclusiones categóricas como eximente para preparar un documento ambiental, cuando el área donde se vaya a realizar la acción o actividad excede el grado de contaminación permitido por los reglamentos vigentes**. Ergo, <u>no basta con demostrar que la estación de gasolina se encuentra en el "LUST List". Tampoco basta con demostrar que el área donde ubica la gasolinera adolece de contaminación</u>.*
>
> ***En este caso los demandantes [recurrentes] tenían que establecer que el área donde ubica la estación de gasolina de Sammy Odeh <u>sobrepasa</u> el grado de contaminación permitido por los reglamentos de la JCA, u otras agencias concernidas. Sobre tal crucial punto no se presentó prueba alguna para establecer cuál era el grado de contaminación que excedía el permitido cuando se tramitó el permiso de reconstrucción o remodelación. Tampoco se presentó prueba que demostrara cuál era el grado de contaminación, si alguno, que tenía o tiene el área donde ubica la estación de gasolina. Tampoco se sometió prueba que demostrara que una estación de gasolina incluida en el "LUST List", es parangón de que sus terrenos adolecen de un grado de contaminación que excede el permitido por la reglamentación vigente.***
>
> *En consecuencia, la parte demandante [parte recurrente] no demostró que Sammy Odeh haya sometido información falsa e incorrecta en la obtención del permiso de reconstrucción y remodelación de la gasolinera y tienda de conveniencia.*
>
> *[…].*[52]

Por los fundamentos antes dicho, el TPI determinó que: "*aquilatada la prueba testifical y documental desfilada y admitida, habiendo escuchado, visto y observado la manera en que los testigos y peritos declararon, apreciados sus gestos, titubeos, contradicciones,*

---

[52] Véase, la Sentencia apelada en el Apéndice del recurso de Apelación KLAN202200646, en las págs. 441-443. Énfasis nuestro.

*manerismos, dudas y vacilaciones en la silla testifical, y la credibilidad que finalmente nos merecieron sus testimonios*",[53] **no procede** la petición de interdicto estatutario instada por los recurrentes al amparo del Artículo 14.1 de la Ley 161-2009, *infra*. En vista de ello, impuso el pago de costas y honorarios de abogado a favor de Sammy Odeh y de la OP-MAC.[54]

El **12 de julio de 2022**, la **DR-OGPe** determinó **no acoger** la Revisión Administrativa y Solicitud de Paralización de Obras de Construcción, núm. 2022- 44593-SDR-009529, de los recurrentes para los permisos:[55] **(1) 2018-248898-PCO-017383**;[56] **(2) 2019-289469-PU-014630**;[57] **(3) 2019-288289-PCOC-003560**;[58] y **(4) 2019-288289-PCOC-005541**.[59]

Inconformes, el **11 de agosto de 2022** los recurrentes acudieron ante nos mediante el recurso de revisión judicial **KLRA202200442** imputando la comisión de los siguientes errores:

1) *Erró la Oficina de Permisos del Municipio Autónomo de Caguas al expedir un permiso de construcción para la construcción de una nueva estación de gasolina, al actuar sin jurisdicción y evaluar los permisos solicitados de forma ministerial sin celebrar una vista pública.*

2) *Erró la Oficina de Permisos del Municipio Autónomo de Caguas al expedir los permisos impugnados para la construcción de una nueva estación de gasolina y tienda de conveniencia, y sus enmiendas y expansiones, en un predio que: (1) lleva más de 6 años sin ningún tipo de operación; (2) se ubica a menos de 1000 pies de escuelas o instituciones educativas; (3) donde no existen estructuras; (4) que fraudulentamente se obtuvo una certificación de exclusión categórica ambiental; y (5) se realizaron obras en una estación que no tenía conformidad legal sin celebración de vista pública e intensificando el uso anterior.*

3) *Erró la Oficina de Permisos del Municipio Autónomo de Caguas al expedir un permiso de uso para la operación de una nueva estación de gasolina sin celebrar una vista*

---

[53] Véase, el Apéndice del recurso de Apelación KLAN202200646, en la pág. 433.
[54] Véase, el Apéndice del recurso de Apelación KLAN202200646, en la pág. 443.
[55] Véase, Apéndice del recurso KLRA202200442, en las págs. 1-4.
[56] Permiso de construcción certificado para estación de gasolina.
[57] Permiso único de operación para estación de gasolina y tienda de conveniencia.
[58] Permiso de construcción enmendado para la estación de gasolina y tienda de conveniencia.
[59] Enmienda a los fines de incluir la instalación de 2 despachadores de gasolina adicionales.

*pública conforme al Reglamento Conjunto de Permisos, y cumplir con los requisitos reglamentarios.*

4) *Erró la Oficina de Permisos del Municipio Autónomo de Caguas al expedir un permiso de enmienda a construcción violentando el derecho al debido proceso de ley de los interventores y en violación a los requisitos estatutarios.*

5) *Erró la Oficina de Permisos del Municipio Autónomo de Caguas al expedir un permiso de enmienda de construcción para la expansión e instalación de dos despachadoras adicionales en una estación nueva y bajo una no conformidad legal.*

Además, el **15 de agosto de 2022** los recurrentes presentaron ante nos el recurso de apelación **KLAN202200646** señalando la comisión de los siguientes errores:

1) *Erró el TPI al no declarar con lugar la petición de interdicto estatutario al amparo del art. 14.1 de la Ley 161 de 2009, aun cuando los recurrentes presentaron prueba clara y robusta de que se obtuvieron permisos mediante una información falsa e incorrecta.*

2) *Erró el Tribunal de Primera Instancia de Caguas al emitir una sentencia imponiendo honorarios de abogados y costas al amparo del artículo 14.1 de la Ley 161 del 2009, aduciendo que el interdicto carecía de méritos aun cuando se demostró mediante prueba testifical, pericial y documental la necesidad de revocar los permisos otorgados y no notificados conforme a derecho.*

Perfeccionados los recursos ante nuestra consideración, procedemos a resolver.

**-II-**

Resumidos los hechos que originan la presente controversia, examinemos el derecho aplicable.

**KLRA202200442**

**A.**

La Ley Núm. 161-2009, conocida como la *Ley para la Reforma del Proceso de Permisos de Puerto Rico*, según enmendada (en adelante, "**Ley 161-2009**"),[60] fue aprobada con el propósito de reformar y transformar el sistema de obtención de permisos. *"[E]s la disposición legal que establece el marco jurídico y administrativo que*

---

[60] 23 LPRA sec. 9011 *et seq.*

*rige la solicitud, evaluación, concesión y denegación de permisos por el Estado Libre Asociado de Puerto Rico.*"[61]

Entre otras, el Artículo 1.5 del Capítulo I de la Ley 161-2009 nos define los siguientes términos:

> ***Certificación de Exclusión Categórica*** — *para propósitos de esta Ley, declaración escrita que somete el solicitante de una determinación final o permiso ante la Oficina de Gerencia de Permisos o ante un Profesional Autorizado, en donde certifica que la acción propuesta es una que, en el curso normal de su ejecución, no tendrá un impacto ambiental y/o que la misma ha sido expresamente excluida del proceso de planificación ambiental mediante una Ley o Reglamento.*[62]
>
> ***Permiso*** — *Aprobación escrita autorizando el comienzo de una acción, actividad o proyecto, expedida por la Oficina de Gerencia de Permisos, por un Municipio Autónomo con Jerarquía de la I a la V, o por un Profesional Autorizado, conforme a las disposiciones de esta Ley y para la cual no se incluyen licencias, certificados de inspección, ni certificaciones.*[63]
>
> ***Permiso de Construcción*** — *Trámite consolidado que incluye una o más de las siguientes actividades: construcción, reconstrucción, remodelación, demolición u obras de urbanización.*[64]
>
> ***Permisos Relacionados a Desarrollo y Uso de Terrenos*** — *aquellos permisos requeridos para realizar mejoras a terrenos u obras o para el uso de una pertenencia, estructura, rótulo, anuncio o edificio, los cuales no incluye aquellos permisos que son requeridos para la operación de un establecimiento;*[65]
>
> ***Permiso Único*** — *Permiso para el inicio o continuación de la operación de un negocio, construcción y/o actividad incidental al mismo en el que se consolida permisos, licencias, autorizaciones o certificaciones, el cual será expedido por la Oficina de Gerencia de Permisos, o los Municipios Autónomos con Jerarquía de la I a la V, conforme a lo dispuesto en el Capítulo VIII de esta Ley.*[66]
>
> ***Uso*** — *el propósito para el cual una pertenencia fue diseñada, es ocupada, usada o se pretende usar u ocupar.*[67]

Además, la Ley 161-2009 crea la Oficina de Gerencia de Permisos ("OGPe") como una Secretaría Auxiliar del Departamento de Desarrollo Económico y Comercio.[68] A partir de la vigencia de la

---

[61] *Laureano v. Mun. de Bayamón*, 197 DPR 420, 433 (2017).
[62] Artículo 1.5 inciso 12. 23 LPRA sec. 9011
[63] Artículo 1.5 inciso 57. 23 LPRA sec. 9011.
[64] Artículo 1.5 inciso 57 (A). 23 LPRA sec. 9011.
[65] Artículo 1.5 inciso 58. 23 LPRA sec. 9011.
[66] Artículo 1.5 inciso 59 (A). 23 LPRA sec. 9011.
[67] Artículo 1.5 inciso 90. 23 LPRA sec. 9011.
[68] Artículo 2.1. 23 LPRA sec. 9012.

Ley 161-2009, cualquier persona que interese solicitar permisos, recomendaciones, licencias, o certificaciones relacionados al desarrollo y uso de terrenos en Puerto Rico o cualquier otra autorización o trámite que sea necesario, según establecido en el Artículo 1.3, 2.5 y 7.3 de esta Ley, podrá hacerlo ante la OGPe, sea a nivel central o regional, **Municipios Autónomos con Jerarquía I a V** o mediante un Profesional Autorizado, según aplique.[69]

En cuanto a una **Pre-Consulta**, el Artículo 8.2 de la Ley 161-2009 dispone lo siguiente:

*[C]ualquier persona que interese un permiso, licencia, certificaciones, autorizaciones, recomendaciones y cualquier trámite necesario o que incida de forma alguna en la operación de un negocio en Puerto Rico podrá solicitar a la Oficina de Gerencia de Permisos o al **Municipio Autónomo con Jerarquía de la I a la V**, según aplique, una orientación en la cual se identificarán las disposiciones de ley y reglamentarias aplicables a tal acción, actividad o proyecto propuesto y la información que conforme a ésta deberá, en su día, presentar el solicitante. De requerirlo el solicitante, acompañando una descripción del proyecto, se le proveerá una lista de los permisos o autorizaciones que, a tenor con las disposiciones de ley y reglamentarias aplicables, deberá obtener para poder comenzar la operación, y de ser aplicable, la construcción del proyecto. En la evaluación de la pre-consulta participarán representantes de los Gerentes de Permisos o el Director de la División de Evaluación de Cumplimiento Ambiental, según aplique a discreción del Secretario Auxiliar o del Director Regional. Como parte de la pre-consulta, el solicitante indicará de manera escrita y detallada, como mínimo, la ubicación propuesta y la naturaleza de la actividad.[70]*

De igual manera, el Artículo 8.4 inciso A de la Ley 161-2009, provee para la otorgación de un **Permiso Único** de la siguiente forma:

*Todo edificio existente o nuevo, con usos no residenciales, así como todo negocio nuevo o existente, obtendrá el Permiso Único para iniciar o continuar sus operaciones, el cual incluirá: permiso de uso; certificación de exclusión categórica; certificación para la prevención de incendios; certificación de salud ambiental; licencias sanitarias; y cualquier otro tipo de licencia o autorización aplicable requerida para la operación de la actividad o uso del negocio. El propósito del permiso único es consolidar e*

---

[69] Artículo 8.1. 23 LPRA sec. 9018.
[70] 23 LPRA sec. 9018a.

*incorporar trámites en una sola solicitud, para simplificar los procedimientos y reducir el tiempo de evaluación y adjudicación de las solicitudes requeridas para iniciar o continuar la operación de un negocio. Disponiéndose que la Oficina de Gerencia de Permisos será la entidad encargada de expedir las certificaciones y licencias necesarias para la expedición de un Permiso Único.*

*Sólo podrá solicitarse un Permiso Único cuando se incluya como parte de la solicitud, la autorización para el uso del negocio o proyecto. Toda persona que posea un permiso de uso vigente, al solicitar una enmienda o cambio de nombre, presentará una solicitud de Permiso Único. El Permiso Único tendrá la vigencia que se establezca en el Reglamento Conjunto.*[71]

Además, se debe tomar en consideración el Artículo 8.5 de la Ley 161 de 2009, para la **evaluación de cumplimiento ambiental** que a continuación se dispone el procedimiento a seguir:

*El proceso de planificación ambiental es un procedimiento <u>informal sui generis</u> excluido de la aplicabilidad de la Ley de Procedimiento Administrativo Uniforme. El Secretario Auxiliar de la Oficina de Gerencia de Permisos, realizará la determinación de cumplimiento ambiental requerida bajo las disposiciones del Artículo 4(B)(3) de la Ley 416-2004, supra, y el reglamento que a los fines de este Artículo y de esta Ley, apruebe la Junta de Calidad Ambiental en cuanto a: <u>las acciones que tome con relación al trámite de los documentos ambientales, a las exclusiones categóricas, a las acciones con relación a la determinación de cumplimiento ambiental, y a las determinaciones finales que se le soliciten, de conformidad con esta Ley; y cualquier acción sujeta al cumplimiento con las disposiciones del Artículo 4(B)(3) de la Ley 416-2004, supra</u>.*

*La Oficina de Gerencia de Permisos fungirá como agencia proponente con relación al proceso de planificación ambiental, **excepto** en aquellos casos en los que, a los **Municipios Autónomos con Jerarquía de la I a la V, se les haya delegado esta facultad como consecuencia del convenio de transferencia establecido en la Ley 81-1991, supra**.*

*La Oficina de Gerencia de Permisos dirigirá el proceso de evaluación del documento ambiental a través de la División de Evaluación de Cumplimiento Ambiental. En el caso de que la Oficina de Gerencia de Permisos sea la agencia proponente, el proceso de planificación ambiental a seguir será el siguiente: cuando el documento ambiental sometido sea una Evaluación Ambiental, la División de Evaluación de Cumplimiento Ambiental evaluará el documento ambiental y remitirá sus recomendaciones al Director Ejecutivo; siendo éste quien determine el cumplimiento ambiental, la cual será considerada un componente de la determinación final sobre la acción propuesta. En caso de que el documento ambiental sometido sea una Declaración de Impacto Ambiental (DIA), la*

---

[71] 23 LPRA sec. 9018c-1.

*División de Evaluación de Cumplimiento Ambiental evaluará la DIA y remitirá sus recomendaciones a la Junta Adjudicativa para que ésta emita la determinación sobre la misma, la cual será un componente de la determinación final sobre la acción propuesta.*

***Sin embargo, cuando el Municipio Autónomo sea la agencia proponente, el proceso de planificación ambiental será el siguiente:*** *el Municipio Autónomo remitirá a la Oficina de Gerencia de Permisos el documento ambiental, sea éste una Evaluación Ambiental o una Declaración de Impacto Ambiental, el cual será evaluado en la División de Evaluación de Cumplimiento Ambiental. Ésta remitirá sus recomendaciones al Secretario Auxiliar o a la Junta Adjudicativa, según aplique, quien determinará el cumplimiento ambiental y remitirá su determinación al Municipio Autónomo, la cual será un componente de la determinación final del permiso solicitado que emitirá oportunamente el Municipio Autónomo.*

***Cuando la acción propuesta sea una exclusión categórica para fines del proceso de planificación ambiental,*** <u>***el solicitante del permiso certificará por escrito y bajo juramento, que la acción propuesta cualifica como una exclusión categórica***</u>***. La Oficina de Gerencia de Permisos, a través de su Secretario Auxiliar o los Profesionales Autorizados podrá emitir una Determinación de Cumplimiento Ambiental por Exclusión Categórica de forma automática, la cual pasará a formar parte del expediente administrativo, y será un componente de la determinación final de la agencia proponente o del Municipio Autónomo con Jerarquía de la I a la V, sobre la acción propuesta.***

*La Oficina de Gerencia de Permisos, los Municipios Autónomos con Jerarquía de la I a la V, la Junta de Calidad Ambiental y los Profesionales Autorizados evaluarán la viabilidad ambiental, mediante una exclusión categórica para permisos verdes y permisos para PYMES. El procedimiento de la viabilidad ambiental para la otorgación de un permiso verde y un permiso para PYMES será establecido mediante el Reglamento Conjunto.*

*Cuando los Municipios Autónomos con Jerarquía de la I a la V tengan jurisdicción para expedir determinaciones finales sobre la acción propuesta, entonces la Oficina de Gerencia de Permisos podrá fungir como agencia proponente, al amparo de esta Ley. Las Declaraciones de Impacto Ambiental y aquellas evaluaciones ambientales que requieran un proceso de evaluación "NEPA-Like Process", serán comentadas por el público en general durante el proceso de planificación ambiental, mediante vista pública, según aplique, y seguirá el procedimiento que establezca la Junta de Calidad Ambiental, mediante el Reglamento Conjunto. Además, la determinación de cumplimiento ambiental será revisada, en conjunto con la determinación final, según se establezca por reglamentación que la Oficina de Gerencia de Permisos adopte a tales efectos.*

*En aquellos casos en que la única acción es la expedición o modificación de un permiso, no sujeto a las disposiciones de esta Ley y bajo la jurisdicción única de la Junta de Calidad Ambiental, no será necesaria la evaluación*

*de los impactos ambientales de la acción propuesta por parte de la División de Evaluación de Cumplimiento Ambiental. En tales casos, la Junta de Calidad Ambiental determinará el mecanismo de evaluación de dichos impactos ambientales a través del reglamento que promulgue.*

*En aquellos casos en que la acción propuesta contemple proyectos cuya operación es regulada por la Junta de Calidad Ambiental, la Oficina de Gerencia de Permisos requerirá a la Junta de Calidad Ambiental recomendación sobre el documento ambiental presentado para dicho proyecto.*

*Dichas recomendaciones deberán ser sometidas dentro del término de treinta (30) días contados a partir de la fecha de notificación de la solicitud de las recomendaciones, transcurrido dicho término, la Oficina de Gerencia de Permisos entenderá que la Junta de Calidad Ambiental no tiene recomendaciones.*[72]

Así pues, el Artículo 9.6 de la Ley 161-2009 dispone que los **permisos son de naturaleza *in rem* y la transferencia automática del permiso único a nombre del nuevo dueño o sucesor**:

*A los fines de esta Ley, los permisos son de naturaleza **in rem**. <u>En ningún caso se requerirá la expedición de un nuevo permiso, siempre y cuando el uso autorizado, permitido o no conforme legal, continúe siendo de la misma naturaleza y no sea interrumpido por un período mayor de dos (2) años. Los permisos de uso para vivienda no tendrán fecha de expiración.</u> En cuanto a usos no residenciales, cuando ocurra un cambio de nombre, dueño o un sucesor, la Oficina de Gerencia de Permisos, Profesional Autorizado o Municipio Autónomo con Jerarquía de la I a la V, según corresponda, **lo transferirá a un permiso único de manera automática, una vez presentada la correspondiente solicitud de transferencia de permiso de uso, a nombre del nuevo dueño o sucesor, siempre y cuando el uso autorizado de la propiedad o establecimiento continúe siendo de la misma naturaleza**, según se establezca en el Reglamento Conjunto de Permisos. Se incluirá en el permiso único el certificado de salud ambiental, la licencia sanitaria, otras licencias aplicables y el certificado de inspección para la prevención de incendios. La Oficina de Gerencia de Permisos, el Profesional Autorizado o Municipios Autónomos con Jerarquía de la I a la V, según corresponda, notificarán la transferencia de las autorizaciones arriba descritas a las agencias y/o municipios aplicables para que tomen las acciones que en derecho procedan. Las autorizaciones transferidas en cumplimiento de este Artículo tendrán el mismo término y fecha de vigencia que la original. Si no se llevó a cabo una inspección, cuando se realice la misma se concederán nuevos términos de vigencia. Cuando un solicitante requiera un permiso de uso o permiso único para establecer una actividad o acción de la misma naturaleza a una ya autorizada en la propiedad y la misma se encuentra*

---

[72] Artículo 8.5. — Evaluación de Cumplimiento Ambiental. 23 LPRA sec. 9018d.

*vigente, pero a nombre de otro dueño, éste podrá presentar el permiso de uso o permiso único existente para obtener de forma automática el permiso, según se establezca en el Reglamento Conjunto de Permisos.[73]*

Una vez se otorga un permiso, el Artículo 9.10 de la Ley 161-2009 establece la **presunción de corrección** —tanto para las determinaciones finales como los **permisos** concedidos— por la OGPe, por el <u>Municipio Autónomo con Jerarquía de la I a la V</u> y por los Profesionales Autorizados. En consecuencia, se dispone lo siguiente:

> **Se presume la corrección y la legalidad de las determinaciones finales y de los permisos expedidos por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V y por los Profesionales Autorizados. <u>No obstante, cuando medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito en el otorgamiento o denegación de la determinación final o del permiso, o en aquellos casos en que la estructura represente un riesgo a la salud o la seguridad, a condiciones ambientales o arqueológicas, la determinación final emitida y el permiso otorgado por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V o por el Profesional Autorizado, deberá ser revocado</u>. La estructura se podrá modificar, conservar o demoler, sólo después de que un Tribunal competente así lo determine y siguiendo con el procedimiento judicial establecido en el Capítulo XIV de esta Ley, además de cumplir con el debido proceso de ley.**
>
> *Además, se dispone que bajo ninguna circunstancia, una determinación final será suspendida, sin mediar una autorización o mandato judicial de un Tribunal competente o el foro correspondiente, en estricto cumplimiento con el debido proceso de ley. Las disposiciones de este Artículo no crearán un precedente reclamable por terceros ajenos a la propiedad objeto del permiso. Entendiéndose que, sujeto a lo dispuesto en esta Ley, una determinación final se considerará final y firme, o un permiso, y no podrá ser impugnado una vez el solicitante haya cumplido con todos los requisitos establecidos en la notificación de determinación final y haya transcurrido el término de veinte (20) días sin que una parte adversamente afectada por la notificación haya presentado un recurso de revisión o un proceso de revisión administrativa, así como haya transcurrido el término de treinta (30) días para solicitar revisión judicial. No obstante, la parte adversamente afectada por una determinación final, podrá ser revisada sujeto a lo establecido en esta Ley. […].[74]*

---

[73] 23 LPRA sec. 9019e.
[74] 23 LPRA sec. 9019i.

Nótese, que, en cuanto al caso que nos ocupa, para revocar un permiso tiene que probarse que fue concedido mediante ***fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito al otorgar el permiso.***

En ese sentido, el Artículo 11.1 de la Ley 161-2009 crea la División de Revisiones Administrativas como organismo adscrito a la Oficina de Gerencia de Permisos ("DR-OGPe"), la cual tendrá la función de revisar las actuaciones y determinaciones de la Junta Adjudicativa, la Oficina de Gerencia de Permisos ("OGPe"), los Profesionales Autorizados y los **Municipios Autónomos con Jerarquía de la I a la V**.[75]

Así, el Artículo 11.8 de la Ley 161–2009 establece **el término para la adjudicación de solicitudes de revisión administrativa ante la DR-OGPe**:

> *Una vez presentada una solicitud de revisión administrativa, el Juez Administrativo tendrá un término de quince (15) días para determinar si acoge la misma. Si en este término se denegase o no se emitiese una determinación a esos fines, en cuyo caso se entenderá rechazada de plano, perderá jurisdicción sobre la misma y comenzará a decursar el término de treinta (30) días para recurrir al Tribunal de Apelaciones desde que se notifique la denegatoria o desde que expiren esos quince (15) días, según sea el caso.* La División de Revisiones Administrativas dispondrá de las solicitudes acogidas ante su consideración dentro de un periodo de noventa (90) días naturales desde su presentación. Dicho término podrá ser prorrogado por treinta (30) días adicionales contados a partir de la fecha de vencimiento, en casos excepcionales. *Si la División de Revisiones Administrativas no adjudicara la solicitud dentro del término aquí dispuesto,* ***dicho foro perderá jurisdicción sobre la misma y comenzará a decursar el término de treinta (30) días para recurrir al Tribunal de Apelaciones. Las resoluciones de la División de Revisiones Administrativas serán consideradas determinaciones finales de la Oficina de Gerencia de Permisos.***[76]

Cabe destacar que la precitada Ley 161-2009, establece la aplicabilidad de las disposiciones de la Ley de Procedimiento

---

[75] 23 LPRA sec. 9021m.
[76] 23 LPRA sec. 9021t.

Administrativo Uniforme ("LPAU"),[77] en las determinaciones de la agencia sobre la concesión de permiso, disponiendo lo siguiente:

> *La Ley de Procedimiento Administrativo Uniforme será de aplicación a todos los procedimientos para la evaluación, el otorgamiento o la denegación de determinaciones finales y **permisos**, recomendaciones, certificaciones, licencias, certificados, incluyendo determinaciones de cumplimiento ambiental relacionados a Declaraciones de Impacto Ambiental, o cualquier otra autorización similar otorgada por la Oficina de Gerencia de Permisos, los **Municipios Autónomos con Jerarquía de la I a la V**, el Profesional Autorizado e Inspector Autorizado, así como la adjudicación de querellas u órdenes administrativas por el Director Ejecutivo, por las Entidades Gubernamentales Concernidas, o los **Municipios Autónomos con Jerarquía de la I a la V**, al amparo de las disposiciones de esta Ley, **salvo** en las instancias que expresamente se disponga lo contrario o en aquellos casos donde esta Ley resulte inconsistente con la Ley de Procedimiento Administrativo Uniforme.[78]*

Cónsono con la política pública que inspiró la Ley 161-2009, se aprobó el **Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos, Reglamento Núm. 7951**, de 30 de noviembre de 2010 (en adelante, "**Reglamento Conjunto**").[79]

En lo pertinente a la controversia que nos ocupa, la Regla 9.5 del Reglamento Conjunto regula los **permisos de uso**. En particular, la sección 9.5.1(a) dispone lo siguiente:

> "*Los permisos de uso son de naturaleza "**in rem**". Por tanto, **no se requerirá la expedición de un nuevo permiso de uso o la renovación del mismo, siempre y cuando el uso continúe siendo el mismo**".[80]*

En particular, la sección 9.5.1. (g) dispone sobre la **validez de los permisos de uso descontinuados** por dos (2) o más años:

> *Si el uso para el cual se expide un permiso se descontinuara por dos (2) años o más, el mismo dejará de ser válido independientemente de que sea un uso permitido o no conforme legal, excepto permisos expedidos para viviendas que no tendrán fecha de vencimiento. El permiso se expide a la propiedad (In Rem); por lo que, un cambio de dueño no requiere un nuevo permiso si mantiene el mismo uso.*

---

[77] Ley Núm. 38-2017. 3 LPRA sec. 9601 *et seq*.
[78] 23 LPRA sec. 9028e.
[79] Para los hechos de este caso, es de aplicación el citado Reglamento Conjunto de 2010, que actualmente está derogado por el **Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, Reglamento Núm. 9473**, de 16 de junio de 2023.
[80] Énfasis nuestro.

Nótese, que literalmente la citada sección 9.5.1. (g), *supra,* no prevé la validez de un permiso de uso descontinuado por más de dos (2) años; de hecho, no toma en cuenta que el desuso sea consecuencia de un acto involuntario, como lo sería el proceso de construcción o pleito judicial. Esa situación fue atendida en este Tribunal de Apelaciones, Región Judicial de Ponce en el caso de *González Muñiz v. ARPe, KLRA200400768,* sentencia de 22 de junio de 2005; cuando expresó:[81]

> *[E]s la doctrina mayoritaria que ha sido reconocida y aplicada por los tribunales federales [...] que establece las circunstancias en las cuales se entiende que no hubo intención del dueño de abandonar el uso no conforme legal de una estructura o edificio. Entre las mismas, se encuentra cuando la descontinuación del uso no conforme legal se debió a la existencia de un pleito legal. [...T]ampoco constituye abandono del derecho al uso no conforme legal el cambio de dueño de la propiedad y que se han considerado actos ostensibles de continuidad del uso no conforme legal el mantener vigentes las licencias para operar un establecimiento. Citas omitidas.*

En ese caso, el TA sostuvo el permiso de uso de una estación de gasolina que había cerrado operaciones por once (11) años, a raíz de un pleito judicial por la división de los bienes gananciales. Razonó que nada en el expediente le indujo a concluir que hubiese habido la intención de descontinuar o abandonar el mismo.

Esta doctrina del *desuso o abandono involuntario* encuentra apoyo en la jurisprudencia federal y estatal discutida por el tratadista, *E.C. Yokley,* en su obra, *Zoning Law and Practice,*[82] que en resumen plantea que si un gobierno local intenta proclamar que la *mera descontinuidad* del uso representa su abandono, esta actuación se debe considerar inconstitucional, cuando se pueda demostrar el abandono o desuso ha sido *involuntario*.

Todavía más, en el campo de la planificación ha quedado establecido que la determinación de un abandono en el uso va a

---

[81] *González Muñiz v. ARPe, supra,* pág. 16, *KLRA200400768* (2005).
[82] Véase, E.C. Yokley, LL.B., J.D., *Zoning Law and Practice,* Chapter 22 *Nonconforming Uses,* §22-12 *Abandonment,* 4th ed., Vol. 4, *2011 Revision by Douglas Scott MacGregor,* LexisNexis 2011.

depender de dos elementos: **(1)** el abandono debe ser voluntario y no atribuible a terceras personas; y, **(2)** deben existir hechos afirmativos que indiquen la <u>intención</u> del concesionario o dueño de la propiedad de abandonar o cesar el uso.[83] En consecuencia, los tribunales generalmente requieren que el abandono sea voluntario.

De otra parte, el Capítulo 25 - Estaciones de Gasolina del **Reglamento Conjunto** está dirigido a reglamentar las estaciones de gasolina.[84] En cuanto a **nuevas gasolineras** o **ampliación de una existente que contemple un aumento de más de 50% de sus despachadoras**, la sección 25.1.2 del citado reglamento establece que:

> *Toda solicitud para **una nueva estación** de gasolina **o ampliación a una existente que conlleve un aumento en el número de despachadoras existentes, mayor a un 50%**, deberá ser acompañada de una certificación donde conste que han sido notificados de la intención de establecer dicha estación de gasolina todos los distribuidores-mayoristas, dueños o arrendatarios de estaciones de gasolina que radiquen dentro del perímetro establecido más adelante a propósito del estudio de viabilidad. Dicha certificación incluirá el nombre y la dirección de las personas notificadas.[85]*

También, la sección 25.1.3 del Reglamento Conjunto por otra parte, detalla el requisito de presentar un estudio de viabilidad para una **nueva gasolinera** o **una existente que contemple un aumento de más de 50% de sus despachadoras**. Respecto a ello, expone:

> *Toda solicitud para una **nueva estación** de gasolina **o ampliación a una existente que conlleve un aumento en el número de despachadoras existentes, mayor a un 50%**, deberá ser acompañada de un estudio de viabilidad que demuestre la necesidad y conveniencia del establecimiento de la misma. [...].*

Por último, en lo concerniente a la **celebración de vistas públicas**, la sección 25.1.4 (a) del Reglamento Conjunto, dispone:

> *a. En todos los casos, la OPGe **podrá** aprobar el*

---

[83] Anderson, American Law of Zoning, Col, 1, Sec. 6.58-6.61, Mandelker, Land Use Law, 5th Ed 2003, Seq. 581.
[84] CAPÍTULO 25 ESTACIONES DE GASOLINA Reglamento Conjunto de Permisos para Obras de Construcción y Usos de Terrenos, 29 de noviembre de 2010.
[85] *Id.* (Énfasis nuestro).

**establecimiento de <u>nuevas estaciones de gasolina</u>, previa celebración de vistas públicas y previa recomendación de la Compañía de Comercio y Exportación**.

**B.**

A tono con lo antes dicho, resulta importante destacar que nuestra jurisdicción ha establecido que las decisiones que toman las agencias administrativas merecen la mayor **deferencia judicial**.[86] Esta norma se basa en el conocimiento especializado ("expertise") y la experiencia que las agencias administrativas poseen sobre los asuntos que le son encomendados.[87] A esta norma de deferencia, va unida una presunción de legalidad y corrección que debe respetarse mientras no se pruebe que la agencia abusó de su discreción.[88] Por ello, la revisión judicial de las decisiones administrativas se limita a determinar ***si la agencia actuó de manera arbitraria o ilegal; o de forma tan irrazonable, que su actuación constituya un abuso de discreción***.[89]

Así pues, se ha establecido que el criterio fundamental bajo el cual un tribunal debe revisar las determinaciones e interpretaciones de una agencia administrativa es el de ***razonabilidad***.[90] De esta manera, se busca evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[91]

**<u>KLAN202200646</u>**

**A.**

De entrada, cabe diferenciar que el ***injunction estatutario*** es independiente del ***injunction tradicional*** y, por consiguiente,

---

[86] *Cruz v. Administración de Corrección*, 164 D.P.R. 341 (2005); *Mun. de San Juan v. J. C. A.,* 152 D.P.R. 673, 688-689 (2000).
[87] *Otero v. Toyota,* 163 D.P.R. 716, 727 (2005).
[88] *Hatillo Cash & Carry v. A.R.P.E.*, 173 D.P.R. 934, 960 (2008).
[89] *Ramos Cardona v. Corp. Centro Bellas Artes*, 178 D.P.R. 867, 883-884 (2010).
[90] *Rebollo v. Yiyi Motors,* 161 D.P.R. 69, 76 (2004).
[91] *Vélez v. A.R.Pe.*, 167 D.P.R. 684, 693 (2006); *Misión Industrial P.R. v. J.P.,* 146 D.P.R. 64, 131 (1998).

generalmente exento de la normativa aplicable a este último.[92] Ello, porque los requisitos del ***injunction tradicional*** son, de ordinario, más rigurosos que los exigidos para el ***injunction estatutario***.[93]

El *injunction tradicional* tiene su origen en la equidad y va dirigido esencialmente a atender situaciones donde no existe otro remedio adecuado en ley para atender los perjuicios que enfrenta una persona, mientras que el *injunction estatutario* proviene de un mandato legislativo expreso. Es por ello, que la concesión de un *injunction estatutario* requiere un tratamiento especial, enmarcado dentro de un examen o escrutinio judicial más acotado.[94] Aunque los criterios rectores para la expedición del *injunction tradicional* no aplican estrictamente, esas disposiciones son guías para la expedición del remedio provisional establecido en la Ley. No obstante, tales guías deben ser atemperadas a las disposiciones y los propósitos de la pieza legislativa que dispone para el *injunction estatutario*. Es decir, deben conciliar con su política pública.

En ese sentido, y en lo pertinente a la controversia presentada, el Artículo 14.1 de la Ley 161-2009, *supra*, permite que se inste en el TPI un recurso de *injunction,* entre otros, para revocar un permiso otorgado por información incorrecta o falsa.[95] En específico, el Artículo 14.1 dispone lo siguiente:

> *La Junta de Planificación, así como cualquier entidad gubernamental concernida, **Municipio Autónomo con Jerarquía de la I a la V** o cualquier otra dependencia o instrumentalidad del Gobierno de Puerto Rico en representación del interés público o una persona privada, natural o jurídica, que tenga un interés propietario o personal que podría verse adversamente afectado, **podrá presentar una acción de injunction, mandamus, sentencia declaratoria, o cualquier otra acción adecuada para solicitar: (1)** <u>la revocación de un permiso otorgado, cuya solicitud se haya hecho utilizando información incorrecta o</u>*

---

[92] *Next Step Medical v. Bromedicon et al.*, 190 DPR 474 (2014).
[93] *Id.; CBS Outdoor v. Billboard One, Inc.*, 179 DPR 391, 409 (2010).
[94] *Next Step Medical v. Bromedicon, supra*, a la pág. 497.
[95] CAPITULO XIV — DISPOSICIONES ANTE EL TRIBUNAL DE PRIMERA INSTANCIA. Artículo 14.1. — **Recursos Extraordinarios para Solicitar Revocación de Permisos, Paralización de Obras o Usos No Autorizados, Demolición de Obras**. 23 LPRA sec. 9024.

*falsa; (2) la paralización de una obra iniciada sin contar con las autorizaciones y permisos correspondientes, o incumpliendo con las disposiciones y condiciones del permiso otorgado; (3) la paralización de un uso no autorizado; (4) la demolición de obras construidas, que al momento de la presentación del recurso y al momento de adjudicar el mismo no cuenten con permiso de construcción, ya sea porque nunca se obtuvo o porque el mismo ha sido revocado.[96]*

Los recursos extraordinarios antes indicados pueden presentarse ante el TPI, indistintamente de haberse presentado una querella administrativa alegando los mismos hechos; lo que provocará que la agencia administrativa **pierda jurisdicción automáticamente sobre la querella**, y cualquier actuación que llevare a cabo con respecto a la misma, será considerada *ultra vires*. Además, el TPI impondrá honorarios de abogados contra la parte que presenta el recurso si su petición resulta carente de mérito y razonabilidad:

> *Indistintamente de haberse presentado una querella administrativa ante la **Junta de Planificación, entidad gubernamental concernida, Municipio Autónomo con Jerarquía de la I a la V o cualquier otra dependencia o instrumentalidad del Gobierno de Puerto Rico**, alegando los mismos hechos, una parte adversamente afectada podrá presentar un recurso extraordinario en el Tribunal de Primera Instancia. Una vez habiéndose presentado el recurso extraordinario al amparo de esta sección, la agencia administrativa perderá jurisdicción automáticamente sobre la querella y cualquier actuación que llevare a cabo con respecto a la misma será considerada ultra vires.*
>
> *El Tribunal de Primera Instancia deberá celebrar vista dentro de un término no mayor de diez (10) días naturales desde la presentación del recurso y deberá dictar sentencia en un término no mayor de veinte (20) días naturales desde la celebración de la vista.*
>
> *En aquellos casos en los cuales se solicite la paralización de una obra o uso, de ser la misma ordenada por el tribunal, se circunscribirá única y exclusivamente a aquellos permisos, obras o uso impugnado, mas no a ningún otro que se lleve a cabo en la propiedad y que cuente con un permiso o autorización debidamente expedida[97]*
>
> *En aquellos casos en los cuales se solicite la paralización de una obra o uso, de ser la misma ordenada por el tribunal, se circunscribirá única y exclusivamente a aquellos permisos, obras o uso impugnado, mas no a ningún otro que se lleve a cabo en la propiedad y que cuente con un permiso o autorización debidamente expedida.*

---

[96] *Id. Énfasis nuestro.*
[97] *Id. Énfasis nuestro.*

*El tribunal impondrá honorarios de abogados contra la parte que presenta el recurso bajo esta sección si su petición resulta carente de mérito y razonabilidad o se presenta con el fin de paralizar una obra o permiso sin fundamento en ley. Los honorarios de abogados bajo esta sección será una suma igual a los honorarios que las otras partes asumieron para oponerse a la petición judicial. En el caso que el tribunal entienda que no es aplicable la presente imposición de honorarios de abogados, tendrá que así explicarlo en su dictamen con los fundamentos para ello. Las revisiones de los dictámenes bajo esta sección ante el Tribunal de Apelaciones se remitirán a los paneles especializados creados mediante este capítulo y dicho foro tendrá 60 días para resolver el recurso de revisión desde la presentación del mismo.*

En fin, el procedimiento especial provisto por el Artículo 14.1, *supra*, al igual que otros interdictos estatutarios, es un mecanismo establecido por un estatuto, independiente, sumario y limitado.[98] Una vez se solicita correctamente el procedimiento especial, el tribunal expedirá una orden de paralización provisional hasta que se ventile judicialmente el derecho de la parte que lo invocó. Nótese, sin embargo, que su concesión ha de evaluarse a la luz de la letra de este artículo y su jurisprudencia interpretativa.[99]

-B-

Sabido es que los foros apelativos no intervendremos con las determinaciones de hechos de los tribunales de instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, salvo que se demuestre que incurrió en pasión, prejuicio, parcialidad o error manifiesto.[100]

A tenor con ello, la Regla 42.2 de Procedimiento Civil dispone que *"[l]as determinaciones de hechos basadas en testimonio oral no*

---

[98] *ARPe v. Rivera*, 159 DPR 429, 443 (2003); *ARPe v. Rodríguez*, 127 DPR 793 (1991); La jurisprudencia citada se refiere al Artículo 28 de la Ley Núm. 76 de 24 de junio de 1975, el cual fue derogado mediante la aprobación de la Ley Núm. 161-2009, supra. Ante la ausencia de jurisprudencia que trate el Artículo 14.1 de la Ley 161-2009, según enmendado, y debido a que se trata de la figura antecesora del actual Artículo 14.1, *supra*, que procuraba esencialmente los mismos objetivos, acudimos a dicha jurisprudencia interpretativa.
[99] *Id.*
[100] *González Rivera v. Robles Laracuente*, 203 DPR 645, 665 (2019) (*Resolución*), Opinión de Conformidad emitida por el Juez Asociado señor Feliberti Cintrón; *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009).

*se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos*".[101]

Esta norma de deferencia judicial está apoyada en que la tarea de apreciación de la prueba testifical está llena de elementos subjetivos y es el foro de instancia quien está mejor posición para aquilatarla.[102] Por lo cual, los foros apelativos solo contamos con "*récords mudos e inexpresivos*".[103]

En consecuencia, las decisiones del tribunal de instancia están revestidas de una presunción de corrección.[104]

**-III-**

A nuestra atención se han presentado dos casos íntimamente relacionados que corresponden a distintos ámbitos del derecho; a saber: el administrativo y el civil. Bien merece decir que el proceso en ambas vertientes ha sido un tanto tortuoso, por no atribuirle algo de sub realismo.

Así, hemos consolidados los recursos KLRA202200442 y KLAN202200646 por considerar que conjuntamente impugnan la otorgación de los mismos permisos otorgados por la OP-MAC y que el TPI sostuvo su validez al amparo del Artículo 14.1 de la Ley 161 de 2009, *supra*.

En síntesis, en ambos recursos KLRA202200442 y KLAN202200646 los recurrentes plantean que se debió celebrar una vista pública antes de otorgar los permisos en controversia ya que se trataba de la construcción de una nueva estación de gasolina, pues la misma no contaba con permiso de uso al estar cerrada por

---

[101] 32 LPRA Ap. V., R. 42.2.
[102] *González Rivera v. Robles Laracuente, supra; Muñiz Noriega v. Muñiz Bonet,* 177 DPR 967, 986-987 (2010); *Dávila Nieves v. Meléndez Marín, supra,* pág. 771; *Argüello v. Argüello,* 155 DPR 62 (2001).
[103] *González Rivera v. Robles Laracuente, supra; Trinidad v. Chade,* 153 DPR 280, 291 (2001) citando a *Pérez Cruz v. Hosp. La Concepción,* 115 DPR 721, 728 (1984).
[104] *López García v. López García,* 200 DPR 50 (2018); *Vargas Cobián v. González Rodríguez,* 149 DPR 859 (1999).

más de dos años; además, obtuvo fraudulentamente una certificación de exclusión de categoría ambiental. Por la cual, aducen que erró la OP-MAC al expedirlos y el TPI al validarlos. **No tienen razón**.

Primeramente, la cuestión medular a resolver estriba en si la estación de gasolina comprada por Sammy Odeh en 2014 no contaba con permiso de uso, ya que dicho permiso había caducado por no operar durante más de dos años.

Ese punto fue resuelto el **27 de septiembre de 2018**, por la OP-MAC cuando emitió la **segunda** *Determinación sobre Pre-Consulta* que en reconsideración sometió Sammy Odeh. Allí, la OP-MAC reconoció que: **(1)** la gasolinera ubica en un Distrito **Comercial Intermedio (C-I)**; **(2)** dicha estación de gasolina llevó sus operaciones con un Permiso de Uso núm. 99-46-D-890-HPU emitido por la ARPE; **(3) el cierre de la referida estación de gasolina fue involuntario,** según demostrado en documentos presentados por el proponente en el caso; **(4)** la demolición de la estructura fue requerida por la compañía de seguros, se negaban a dar cubierta por el mal estado de la estructura; y, **(5) los tanques de almacenaje de combustible permanecen en el predio, lo que demuestra la intención de continuar operaciones**. Por lo cual, concluyó lo siguiente:

> *Por lo anterior, la Oficina de Permisos concluye que a pesar de que el uso no ha operado por un término mayor de dos (2) años, lo cierto es que el uso ha sido uno ininterrumpido, ya que existe evidencia del interés del propietario de continuar con la operación de dicho uso. Por lo tanto, el uso propuesto cumple y puede ser solicitado como un cambio de dueño o de nombre. [...].[105]*

Nótese, que la OP-MAC tuvo ante sí —entre otros documentos— el *Permiso de Operación Conforme al Reglamento para*

---

[105] Véase, Apéndice del recurso KLRA202200442, en las págs. 98-99. Énfasis nuestro.

*el Control de Tanques de Almacenamiento Soterrados de la Junta de Calidad Ambiental ("JCA"), firmado el 28 de junio de 2018 por Wilmarie Rivera Otero, Jefa de la División de Control de Tanques de Almacenamiento Soterrados, Área de Calidad de Agua,*[106] y la *Carta de 7 de junio de 2016 del Sr. Jan Carlos Rodríguez, Director de Red de Estaciones de Total Petroleum Puerto Rico Corp ("TPPRC"),*[107] ello con la intención de continuar la operación de la estación de gasolina comprada por Sammy Odeh.

Además, en la vista celebrada el 17 de junio de 2022 ante el TPI, el Sr. Akram Odeh, gerente de ventas de Sammy Odeh declaró sobre la intención al momento de comprar la estación de gasolina:

> […]
>
> **P ¿Cuál era la intención cuando se adquiere esa propiedad, para allá para el 2014?**
> **R Pues cuando nosotros compramos, realmente compramos una estación de gasolina. No es que compramos un solar. A Total se le compra una estación de gasolina. Y, de hecho, cuando se hace la compraventa se firma simultáneamente un contrato de suministro de gasolina por 20 años.**
> **P** Al día de hoy, ¿ese contrato de suministro está vigente?
> **R** Actualmente no está vigente. Porque por mutuo acuerdo eh, cesamos el contrato.
> **P ¿Qué documento, si alguno, le presentó usted, la estación Total sobre los permisos de usos correspondientes a esa estación de gasolina?**
> **R Ellos me proveyeron copia del permiso de uso de esa estación que fechaba para**…
> **P** ¿De qué año es ese permiso?
> **R** 1999
> **P** Ese permiso, **¿cuál es el status de ese permiso? Independiente de los permisos que están en controversia**.
> **R Que está vigente. Y nunca ha sido revocado**.
> **P** Ese permiso en particular…
> **Licenciado Díaz:** Señoría, tengo que objetar. Porque es su opinión. Está testificando una opinión.
> **Juez:** No. Se le permite.
> **R Que está vigente y que nunca ha sido revocado**.[108]
> […]

---

[106] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 110-111.

[107] Véase, Apéndice de la *Oposición a Revisión Administrativa* del recurso KLRA202200442, en las págs. 107.

[108] Véase, la TPOE, de la vista del 17 de junio de 2022, a la pág. 30. Énfasis nuestro.

Todavía más, el perito de los recurrentes, Ing. Edwin A. Ayala Rodríguez, declaró:

> [...]
>
> **P** Okey. Ahora bien, testigo. **Nos había dicho que con relación a la construcción nueva. ¿Usted entiende que es una construcción nueva porque dejó de operar por un tiempo? ¿Es correcto?**
>
> **R Por dos razones.**
>
> **P** ¿Cuál es la primer razón?
>
> **R Una porque no tengo evidencia de que estuvo operando por más de dos años y la segunda porque la construcción fue más de 50 por ciento, basado en la definición.**
>
> **P Vamos a la primera. Usted dice de que no tiene evidencia de que estuvo operando por más de dos años.**
>
> **R Correcto.**
>
> **P ¿Leyó usted el Memorial Explicativo que se sometió en la segunda Preconsulta?**
>
> **R Sí.**
>
> **P Que es la que... ¿Diga si es o no cierto que ese Memorial Explicativo contenía 16 anejos?**
>
> **R Eso es correcto.**
>
> **P ¿Y de esos anejos, fue evaluado por el Municipio Autónomo de Caguas?**
>
> **R Sí. Es correcto.**
>
> **P** Entonces. **¿Usted conoce cómo se ha interpretado el concepto de interrupción de tiempo de un Permiso de Uso?** No de construcción. Un permiso de uso. **¿Usted tiene conocimiento?**
>
> **R Sí.**
>
> **P ¿Cómo se ha interpretado ese concepto?**
>
> **R <u>Yo entiendo que tiene que haber la intención de haber operado</u>.**
>
> **P** La intención de haber operado. **¿Y qué más?**
>
> **R Eso es lo que sé.**
>
> **P ¿Perdón?**
>
> **R Eso es lo que conozco.**[109]
>
> [...]

Cónsono con lo anterior, la OP-MAC no erró al determinar que, desde el momento en que Sammy Odeh adquirió la estación de gasolina, tuvo siempre la intención de reabrirla al público como gasolinera. Así lo hizo. Es por ello, que a pesar de no haber despachado gasolina por un periodo mayor de dos años, **no se puede concluir que Sammy Odeh renunció al permiso de uso de la gasolinera**. Por tal razón, los procesos ante la OP-MAC **no**

---

[109] Véase, la TPOE, de la vista del 17 de junio de 2022, en el contrainterrogatorio a las págs. 12 - 13. Énfasis nuestro.

**correspondían a aquellos propios de una <u>nueva estación de gasolina</u>**. De manera que, las <u>vistas públicas</u> que, según los recurrentes debían ocurrir previo a la emisión del permiso **2018-248898-PCO-017383**,[110] y subsiguientes permisos, **no son de aplicación ni necesarias para este caso**. En ese sentido, el permiso de uso y localización de la estación de gasolina adquirida por Sammy Odeh resulta ser <u>antes</u> de la prohibición de ubicación a menos de 1,000 pies de instituciones educativas.

Cabe indicar que la OP-MAC tomó en consideración que la estructura de antigua estación de gasolina fue demolida por requerimiento de las compañías de seguros, que se negaban a dar cubierta por el mal estado de la estructura, por lo cual, el lugar donde se realizó la reconstrucción y remodelación no se trata de un terreno vacante que pueda constituir una nueva construcción.

Tampoco cabe hablar de que esta estación de gasolina no contaba con tienda de conveniencia, razón por la cual la reconstrucción y remodelación de la gasolinera y *mini market* constituyen una nueva construcción. Al respecto, el testigo de los recurrentes, Sr. Felix F. Bermúdez Vega, gerente de área en el departamento de ventas de Total Petroleum del 2012 – 2020, declaró:

> […]
> P  Vamos a ubicarnos en el tiempo. **¿En la estación de gasolina había cuatro surtidores?**
> **R  Eso es correcto**.
> P  ¿Indicó a preguntas del compañero, que no había una tienda de conveniencia?
> R  **Una tienda de conveniencia como se conoce hoy en día, no**.
> P  No.
> R  Era …sí.
> P  La pregunta es simple. A preguntas del compañero, **¿usted indicó que no había una tienda de conveniencia?**
> **R  No. Él tenía artículos. Unos artículos dentro del edificio**.
> **P  ¿Qué artículos tenía? ¿Vendía algunos artículos?**

---

[110] Permiso de construcción certificado para estación de gasolina.

**R  Sí.**

P  ¿Cómo qué?

R  Sí.  Él tenía allí unas papitas, tenía allí.., la última vez que estuve en esa estación había un escritorio, había una caja de cobro, habían eh, artículos para perfumes de carros, cuando se lavaban los carros. Que le llamaban la...

P  ¿Tenía hielo? ¿Venta de hielo?

R  Había, sí.

P  ¿Refrescos de todas clases?

R  Sí.  Había refrescos. Sí.

P  ¿Había refrescos? Dígame usted, de acuerdo a su experiencia, ¿esos son artículos que se venden en una tienda de conveniencia?

R  Sí.

P  Le pregunto.

R  Claro que sí.

**P**  Okay. O sea, **que ¿podemos decir que sí se vencían artículos que se venden en una tienda de conveniencia? Dígame si estoy correcto en mi apreciación**.

**R  Eso es correcto licenciado**.

[...].[111]

De igual modo, se desprende que la instalación de dos despachadoras de gasolina, adicionales a las cuatro existentes, no constituyen un exceso del 50 por ciento.

En segundo orden, los recurrentes plantean que la Certificación de Cumplimiento Ambiental por Exclusión Categórica, expedida por la OGPe en favor de Sammy Odeh,[112] al amparo de la exclusión núm. 45 contenida en la Resolución 11 – 17 emitida por la JCA, fue obtenida mediante información falsa e incorrecta.

En específico, en el apartado de <u>Condiciones Generales 1.b.</u> <u>de la Certificación de Cumplimiento Ambiental por Exclusión</u> <u>Categórica</u>, en lo pertinente, expresa:

[...]

*Condiciones Generales*
*De acuerdo con la solicitud de esta Determinación, se certificó el cumplimiento con los siguientes requisitos, cuyo incumplimiento podrá repercutir en la revocación de esta Determinación:*

---

[111] Véase, la TPOE, de la vista del 10 de junio de 2022, en el contrainterrogatorio a las págs. 63 - 64. Énfasis nuestro.
[112] Véase, el Apéndice del recurso de Apelación KLAN202200646, en las págs. 511-513.

*1. Las actividades de uso o de construcciones livianas de nuevas estructuras no están ubicadas o desarrolladas en:*

**a.        ...**

**b. Áreas en las que la Junta de Calidad Ambiental (JCA) u otras agencias gubernamentales estatales o federales hayan determinado que existe un grado de contaminación que excede el permitido por los reglamentos vigentes.**[113]

Arguyen los recurrentes que para la fecha en que se peticionó la exclusión categórica núm. 45, la estación de gasolina adquirida por Sammy Odeh figuraba en la lista de "LUST" ("Leaking Underground Storae Tank", t/c/c **"LUST"**) y no lo divulgó. Tampoco tiene razón.

De entrada, no hay evidencia alguna de que Sammy Odeh o algún representante de la OP-MAC, OGPe o JCA hayan actuado de forma fraudulenta al momento de expedir la Certificación de Cumplimiento Ambiental por Exclusión Categórica. De otra parte, tanto el perito presentado por los recurrentes como el perito de Sammy Odeh, dieron opiniones diametralmente opuestas sobre este punto.

Ante ello, el racional utilizado por el TPI al abordar esta controversia, estribó en que el antes citado apartado 1.b., dispone *que no se podrán utilizar las exclusiones categóricas como eximente para preparar un documento ambiental, cuando el área donde se vaya a realizar la acción o actividad excede el grado de contaminación permitido por los reglamentos vigentes.* En ese sentido, no bastó con demostrar que la estación de gasolina se encuentra en el "LUST List", ni con demostrar que el área donde ubica la gasolinera adolece de contaminación. Sobre el particular, el foro sentenciador correctamente resolvió que los recurrentes no presentaron prueba alguna del cuál era el grado de contaminación permitido por los

---

[113] *Id.*, a la pág. 511.

reglamentos de la JCA, u otras agencias concernidas, cuando se tramitó el permiso de reconstrucción o remodelación de Sammy Odeh.

En fin, la expedición de los permisos: **(1) 2018-248898-PCO-017383**;[114] **(2) 2019-289469-PU-014630**;[115] **(3) 2019-288289-PCOC-003560**;[116] y **(4) 2019-288289-PCOC-005541**,[117] emitidos por la OP-MAC a favor de Sammy Odeh, no son producto de una actuación arbitraria, ilegal o irrazonable que constituyan un abuso de discreción que requiera nuestra intervención.

Por otra parte, el TPI determinó que, como objetivo principal para la concesión del interdicto bajo el Artículo 14.1 de la Ley 161-2009, los recurrentes no presentaron la prueba suficiente para evidenciar el acto fraudulento o engañoso de Sammy Odeh en la obtención del permiso reconstrucción y remodelación. Tal determinación, merece nuestra deferencia.

En cuanto a la imposición de honorarios y costas, a pesar de que los recurrentes lo señalan como error, nuestro ordenamiento jurídico los contempla y el TPI tuvo, dentro de su apreciación, a bien imponerlos. A la luz de lo anterior, ello no constituye un abuso de discreción, por lo que es meritorio concederle nuestra deferencia.

**-IV-**

Por los fundamentos antes expresados, **se confirman los casos consolidados KLRA202200442 y KLAN202200646**.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[114] Permiso de construcción certificado para estación de gasolina.
[115] Permiso único de operación para estación de gasolina y tienda de conveniencia.
[116] Permiso de construcción enmendado para la estación de gasolina y tienda de conveniencia. Obsérvese, que por error involuntario se expresó el núm. 2019-288289-PCOC-**003580**, cuando lo correcto es 2019-288289-PCOC-**003560.**
[117] Enmienda a los fines de incluir la instalación de 2 despachadores de gasolina adicionales.